**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| WILLIAM M. CODY, THOMAS S. NELSON, and JAMES SCHAEFER, individually and on behalf of all others similarly situated, | No. 1:15-cv-13295-GAO CLASS ACTION |
| Lead Plaintiff, | |
| v. | DEMAND FOR JURY TRIAL |
| CONFORMIS, INC., PHILIPP LANG, and PAUL WEINER, | |
| Defendants. | |

## AMENDED CLASS ACTION COMPLAINT

Lead Plaintiff William M. Cody, Thomas S. Nelson, and James Schaefer (collectively "the ConforMIS Investor Group") allege the following based upon the investigation of Lead Counsel, which included a review of SEC filings by Defendant ConforMIS, Inc. ("ConforMIS" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories, press releases and other public statements issued by the Company, media reports about the Company, and interviews with several confidential witnesses. Lead Plaintiff believes that substantial additional evidentiary support will exist for these allegations after a reasonable opportunity for discovery.

## <u>INTRODUCTION</u>

1.       This is a federal securities class action on behalf of all persons other than Defendants who purchased ConforMIS securities either (1) pursuant and/or traceable to the Company's Registration Statement and Prospectus issued in connection with the Company's July 1, 2015 initial public offering (the "IPO") or (2) on the open market between July 1, 2015 and August 28, 2015, both dates inclusive (the "Class Period"), seeking to recover compensable damages caused by Defendants' violations of the Securities Act of 1933 (the "Securities Act") and under the Securities Exchange Act of 1934 (the "Exchange Act").

2.       ConforMIS is a medical technology firm that develops, manufactures, and sells joint-replacement implants that are customized for each patient's unique anatomy.

3.       ConforMIS went public via an IPO on July 1, 2015, issuing 10.35 million shares and raising aggregate net proceeds of approximately $140 million pursuant to a Registration Statement and Prospectus declared effective as of June 30, 2015.

4.       The Registration Statement and Prospectus touted the benefits of the Company's knee-replacement products and supposed superiority over other market alternatives. The

Prospectus also stated that the Company's manufacturing and testing processes complied with

the FDA's Quality System Regulations ("QSR"), that that Company inspected its products

throughout the manufacturing process to ensure compliance with specifications, and that the

Company conducted regular audits of its suppliers' processes.

5.       On August 11, 2015, the Company held an earnings call for investors. On that

call, the Individual Defendants touted the "streamlined operations" and reduced "manufacturing

and overhead cost structure" of their new manufacturing facility, as well as the improvements in

the Company's gross margins that they expected would result.

6.       These statements were false and misleading because they failed to disclose that:

(i) the Company's manufacturing and-quality control processes were deficient because its

employees cut corners in critical areas of the manufacturing process in order to increase

production numbers as required by management; and (ii) as a result of the flaws in the

Company's manufacturing process, a number of the Company's knee-replacement product

systems were defective.

7.       The risk created by the Company's deficient manufacturing and quality controls

materialized on August 31, 2015, when the Company announced a voluntary recall of patient-

specific instrumentation for certain of its knee-implant products. This recall, which affected

approximately 950 instrumentation sets in total, was the result of patient complaints of moisture

on the instrumentation—moisture which turned out to be ethylene glycol, better known as

antifreeze.

8.       As a result of the recall, the Company was forced to cut its production capacity

substantially as it switched to a different, lower-capacity sterilization process and investigated

the cause of the contamination. As a result, the Company reduced its expected guidance for 2015 by $8 million.

9.     On this news, the Company's stock dropped $3.78, or 19.11%, to close at $16.00 on August 31, 2015. On September 2, 2015, the share price closed at $14.18 per share.

10.     As a result of the precipitous decline in the market value of the Company's securities, Lead Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

11.     The claims asserted herein arise under Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k, 77o), Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a)), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5).

12.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. §78aa).

13.     Venue is proper in this District under Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b), as ConforMIS maintains its principal executive offices in this District.

14.     In connection with the acts, conduct, and other wrongs alleged herein, Defendants used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications, and the facilities of the national securities exchange.

## PARTIES

*Plaintiffs*

15.     "The ConforMIS Investor Group," consisting of William M. Cody, Thomas S. Nelson, and James Schaefer, was appointed Lead Plaintiff on November 10, 2015. As set forth in

the certifications submitted on November 2, 2015 in connection with the Lead Plaintiff motion

and incorporated by reference herein, Cody, Nelson, and Schaefer purchased the common stock

of ConforMIS during the Class Period and were damaged thereby. *See* ECF No. 13-2.

*Defendants*

16.     Defendant ConforMIS is a Delaware corporation with principal executive offices

at 28 Crosby Drive in Bedford, Massachusetts. Its stock trades on NASDAQ under the ticker

symbol "CFMS."

17.     Defendant Philipp Lang has served at all relevant times as President and Chief

Executive Officer of ConforMIS.

18.     Defendant Paul Weiner has served at all relevant times as Chief Financial Officer

of ConforMIS.

19.     Together, Lang and Weiner are the "Individual Defendants."

**SUBSTANTIVE ALLEGATIONS**

**ConforMIS's Business**

20.     ConforMIS was founded in 2004 in Redwood City, California. It moved to

Burlington, Massachusetts in 2008 and then to Bedford, Massachusetts in 2012.

21.     ConforMIS's primary business is the design, manufacture, and sale of knee-

replacement products, including the iTotal, the iUni G2, and the iDuo G2. It has sold more than

30,000 knee implants in the United States and Europe, and it describes itself to investors and to

patients as "the only company offering a broad line of customized knee implants designed to

restore the natural shape of a patient's knee."

22.     Nearly all of ConforMIS's revenue is generated through sales of its knee-replacement products. In 2014, ConforMIS generated $48.2 million in revenue from sales of these products.

23.     For each implant, ConforMIS develops a customized surgical plan.

24.     Each ConforMIS implant comes with a full set of patient-specific, single-use surgical instruments and cutting guides called "iJigs," which guide the surgeon in executing the surgical plan.

25.     ConforMIS touts its customized implants and iJig instruments as having numerous advantages over its competitors' "off-the-shelf" implants, including:

- Because customized implants fit better, they are more stable, less painful, and better-functioning;

- The implantation surgery is simpler, shorter, more precise, and more efficient;

- The implantation surgery requires less tissue and bone removal, resulting in faster and less painful post-operative recovery, fewer post-operative adverse events, and better long-term joint function;

- Because each iJig is "precisely sized and shaped to match the targeted anatomy in only one location and with one orientation," they help surgeons fit and align the implant properly;

- Each surgery requires fewer instruments—instead of 5-10 trays of reusable instruments of various shapes and sizes, surgeons only need a single tray of iJig instruments that are guaranteed to be appropriate for the particular patient and procedure;

- Because each surgery requires fewer instruments, there is a lower risk of instrument contamination, so infections are less likely; and

- Because iJigs are single-use and shipped with each implant, hospitals avoid the costs and risks of maintaining, sterilizing, and storing large quantities of reusable instruments.

Prospectus; ConforMIS, Inc., http://www.conformis.com (last visited Jan. 7, 2016).

26.     As of May 31, 2015, ConforMIS had 353 full-time employees: 87 in sales and

marketing; 33 in research and development; 158 in manufacturing and service; 40 in regulatory,

clinical affairs, and quality activities; and 35 in general administrative and accounting activities.

27.     ConforMIS designs its products by using its proprietary iFit Image-to-Implant®

technology platform, which has five steps.

     a.   ConforMIS receives a CT scan of the patient's knee.

     b.   ConforMIS's software converts the CT scan into a 3-D model of the knee.

     c.   ConforMIS engineers use computer-aided design (CAD) software to design an

        implant and associated iJig instrumentation matching the 3-D model of the knee.

     d.   ConforMIS develops a patient-specific surgical plan, including surgical steps,

        measurements, and orientations, and provides it to the surgeon through a platform

        called iView.

     e.   ConforMIS manufactures and delivers the implant and associated iJig

        instrumentation to the hospital shortly before the surgery, via its "iFit Just-in-

        Time Delivery" model.

28.     As of June 2015, ConforMIS had operational manufacturing facilities in Bedford,

Massachusetts and Burlington, Massachusetts, and was in the process of completing validations

for a third facility in Wilmington, Massachusetts.

29.     In July 2015, after its IPO, the Company moved its primary manufacturing

operations to the Wilmington facility. It subsequently vacated the Burlington facility.

30.     At all relevant times, ConforMIS has manufactured all of its patient-specific iJig

instrumentation in its own facilities in Burlington and Wilmington via its iFit® 3D Additive

Printing technology.

31.     At all relevant times, ConforMIS has manufactured most of the tibial components used in its implants, but has outsourced the manufacture of femoral and other implant components to third-party suppliers.

32.     On information and belief, iJigs were cleaned ultrasonically in ConforMIS's facilities before being sterilized.

33.     Ultrasonic cleaning usually has four steps: (1) submerging the item in cleaning solution; (2) introducing ultrasonic sound waves over a specific time period, which scrub the item clean as tiny bubbles rapidly form and then implode around the item; (3) rinsing off the solution; and (4) drying the item.

34.     ConforMIS has used different sterilization methods at different times, including hydrogen-oxide sterilization and ethylene-oxide sterilization.

35.     Ethylene-oxide sterilization is more efficient than hydrogen-peroxide sterilization, but ethylene-oxide sterilization has a much higher risk of leaving dangerous residues, including ethylene oxide itself, ethylene chlorohydrin, and ethylene glycol.

36.     On information and belief, ConforMIS primarily used hydrogen-peroxide sterilization before its IPO.

37.     At some point in 2014, ConforMIS decided to outsource its sterilization process to an outside vendor called STERIS.

38.     After its IPO, ConforMIS began to rely more heavily on ethylene-oxide sterilization.

### Applicable Regulations and Standards

39.     ConforMIS's devices have been cleared for commercial distribution in the United States through the FDA's 510(k) premarket notification process.

7

40.     Under the 510(k) process, new medical devices can be sold commercially without going through the rigorous premarket approval process "if the FDA finds it is 'substantially equivalent' to another device exempt from premarket approval." *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 317 (2008); 21 C.F.R. § 807.92. However, 510(k) clearance does not require or reflect an FDA finding that a device is safe and effective.

41.     The FDA's Quality System Regulations ("QSR") "govern the methods used in, and the facilities and controls used for, the design, manufacture, packaging, labeling, storage, installation, and servicing of all finished devices intended for human use." 21 C.F.R. § 820.1(a).

42.     Rather than prescribe precise rules governing every conceivable device, the QSR place the burden on manufacturers to develop and implement processes to ensure that the devices manufactured and delivered to customers consistently meet all requirements and specifications of the relevant FDA-approved device. The QSR provide a framework, and manufacturers are affirmatively required to "develop and follow procedures and fill in the details that are appropriate to a given device according to the current state-of-the-art manufacturing for that specific device." 61 Fed. Reg. 52602; *see also Horowitz v. Stryker Corp.*, 613 F. Supp. 2d 271, 279 (E.D.N.Y. 2009) (the QSR "leave it up to the manufacturer to institute a quality control system specific to the medical device it produces to ensure that such device is safe and effective").

43.     As part of the QSR framework, device manufacturers are required to "develop, conduct, control, and monitor production processes to ensure that a device conforms to its specifications" and to establish any "process control procedures" as may be necessary to ensure such conformance. 21 C.F.R. § 820.70.

44.     In particular, the QSR require manufacturers to "establish and maintain procedures to prevent contamination of equipment or product by substances that could reasonably be expected to have an adverse effect on product quality." 21 C.F.R. § 820.70(e).

45.     Ethylene glycol, better known as antifreeze, forms when ethylene oxide reacts with water.

46.     It is well known in the medical-device industry that ethylene glycol will form if an item with excess water goes through ethylene-oxide sterilization.

47.     Ethylene glycol is moderately toxic and therefore "could reasonably be expected to have an adverse effect on product quality."

48.     Under the QSR, ConforMIS had an obligation to establish and maintain procedures to prevent the contamination of its devices by ethylene glycol—such as by verifying that its devices were adequately dry before conducting ethylene-oxide sterilization, or by inspecting them after sterilization to ensure that the devices were not contaminated.

49.     The QSR also require processes to be "validated with a high degree of assurance and approved according to established procedures" and subjected to regular quality audits to assure that such processes and their validation are effective. 21 C.F.R. §§ 820.75(a), 820.22; *cf. United States v. H.W. Andersen Prods.*, 2:95-CV-00315, 1997 U.S. Dist. LEXIS 3080, at *1 (M.D.N.C. Jan. 24, 1997) (applying the QSRs to the validation of sterilization processes).

50.     Under the QSR, ConforMIS had an obligation to validate its sterilization process and contamination controls, and to conduct regular quality audits to ensure that these processes and controls and their validation were effective.

51.     Because ConforMIS's devices are customized for each patient and are to be implanted inside each patient's body, it is especially important for each device to be free of defects and contaminants.

52.     If a surgeon discovers a problem with a ConforMIS implant or instrumentation set in the middle of surgery, he will not be able to find an equivalent item in the hospital's inventory. If the problem forces a surgeon to use a generic implant or instrument, this can result in implantation difficulties, improper fit, and the need for addition bone cuts.

53.     Therefore, ConforMIS's business depends upon its maintaining a reputation among surgeons and patients for reliably producing devices that are free from defects or contaminants.

**ConforMIS's Deficient Manufacturing and Quality-Control Processes**

54.     The manufacturing, testing, and quality assurance at ConforMIS were highly flawed.

55.     According to several confidential witnesses, supervisors at the Bedford and Burlington manufacturing facilities were so focused on increasing production levels and reducing costs that they pressured manufacturing technicians into taking shortcuts and cutting corners with regard to quality assurance, including with cleaning and sterilization.

56.     Confidential Witness 1, a Lead CAD Engineer who worked at ConforMIS from June 2011 until September 2014 in both the Burlington and Bedford locations, characterized working conditions at ConforMIS as a "sweat shop" due to pressure from the Company's Senior Vice President of Operations to increase production.

57.     Confidential Witness 2, a Manufacturing Technician at the Burlington facility from October 2014 until June 2015, described the supervisors as "obsessed with numbers and meeting certain quotas," which led to cutting corners.

58.     According to Confidential Witness 3, who worked as a Manufacturing Technician at the Burlington facility from November 2014 until July 2015, managers cut corners because they were more concerned about their numbers than about the quality of the product, as they were more likely to receive promotions if their numbers were high.

59.     These shortcuts compromised, among other things, ConforMIS's cleaning process for iJigs.

60.     According to Confidential Witness 3, ConforMIS's protocol required iJigs to be cleaned ultrasonically for twenty minutes, but employees were instructed to cut the cleaning time in half. This shortcut decreased the effectiveness of the cleaning process.

61.     Confidential Witness 2 also witnessed at least one supervisor instructing employees to cut cleaning time in half.

62.     According to Confidential Witness 4, a Polishing Technician at ConforMIS's Bedford location from January 2015 to March 2015, it was well-known among ConforMIS employees that certain items were being cleaned for only ten minutes instead of the proper twenty minutes.

63.     By pressuring employees to reduce the time spent cleaning iJigs, ConforMIS created a significant risk that the iJigs would not be sufficiently dry by the time they entered the sterilization process. By failing to ensure that the iJigs were dry before sterilization, it created the risk that ethylene glycol residue would form on the instrumentation. In fact, this risk became

reality, forcing the Company to recall approximately 950 implants because of moisture on their instrumentation sets.

64.     If ConforMIS's manufacturing and quality-control processes had complied with the QSR, the Company would have established and followed procedures to ensure that it was not shipping surgical instruments with antifreeze on them, such as by ensuring that the instruments were properly dried before sterilization or by checking for contaminants before or after sterilization.

65.     Confidential witnesses also reported that the Company had deficient sterilization processes and failed to inspect products to ensure that the Company's products were free of excess moisture.

66.     For example, one method of testing a sterilization process is to place a small bacterial sample, called a "biological indicator," with the items undergoing sterilization. Afterwards, to test whether the sterilization was effective, the indicator can be easily checked for the presence of bacteria.

67.     However, according to Confidential Witness 3, on at least one occasion, a ConforMIS supervisor instructed an employee to re-use a biological indicator, defeating the very purpose of the test. Such a practice would create the impression that a sterilization process was effective, even if it had not been effective.

68.     According to Confidential Witness 5, a business analyst between November 2012 and February 2015, after sterilization was outsourced to STERIS, ConforMIS's Quality Group was more concerned about having the correct paperwork than about STERIS effectively sterilizing the knee products.

69.     Upon information and belief, ConforMIS employees did not inspect its products for moisture after cleaning and before sending them to STERIS for sterilization.

70.     According to Confidential Witness 6, a Manufacturing Supervisor between May 2013 and February 2015, ConforMIS did not inspect its products for moisture or other contaminants after receiving them from STERIS and before shipping them to patients.

71.     According to Confidential Witness 6, ConforMIS sent pallets containing 40 to 50 boxes of medical devices to STERIS. STERIS then put entire pallets through the ethylene-oxide sterilization process— without opening the boxes to check the product for moisture or contamination—before sending them back to ConforMIS.

72.     According to Confidential Witness 6, ConforMIS employees failed to inspect the products upon their return from STERIS and prior to shipping them out to customers. Such an inspection would have added time and expense to the overall process.

73.     Around September 2014, Confidential Witness 6 raised concerns about STERIS's sterilization processes with several quality-control personnel at ConforMIS, but the concerns were ignored by management.

74.     According to Confidential Witness 6, the pressure to increase production came from Matthew Scott, the Senior Vice President of Operations.

75.     The Company also had deficient manufacturing processes which negatively affected patient outcomes. For example, on several occasions, the iJigs and cutting guides were inaccurate or inappropriate for the intended patient.

76.     In one case around April 2015, a surgeon contacted ConforMIS to inform them that the iJigs he'd received for a patient's surgery were faulty and did not fit the patient, which had put the patient's knee at risk and forced the surgeon to install an off-the-shelf implant

instead. In other instances, the incorrect cutting guides directed surgeons to make incorrect bone cuts leading to implantation difficulties, improper fit, and the need for addition bone cuts.

77.     According to Confidential Witness 2, similar iJig manufacturing mishaps—severe enough that they did not fit and could not be used—occurred at least four times in the past year.

78.     Confidential Witness 3 also confirmed that inconsistencies with iJig manufacturing were commonplace.

## **Prior Recalls**

79.     The flaws in ConforMIS's manufacturing and quality control are further demonstrated by the fact that the Company had experienced several other recalls in recent years.

80.     In July 2009, ConforMIS recalled 10 iUni sets due to microscopic cracks, which created a risk of patients needing premature revision surgery.

81.     In August 2012, ConforMIS recalled 1,427 units of the iTotal CR knee-replacement device because it needed to add prominent updates to the surgical technique guide in order to avoid issues inserting the polyethylene inserts, which could increase the risk of polyethylene wear, which is one of the most common reasons for patients to need revision surgery.

82.     In December 2014, the Company had to recall a knee implant that it had shipped with the wrong tibial insert, which could result in the inserts not fitting the patient.

83.     These recalls demonstrated significant problems with ConforMIS's manufacturing and quality control which significantly and materially affected its business and operations.

84.     While problematic for any manufacturer of medical devices—particularly those designed to be implanted inside patients' bodies—manufacturing and quality-control problems

can be particularly disruptive for ConforMIS because its implants are customized. If a surgeon discovers a manufacturing defect in the middle of an implantation surgery, he cannot easily locate an equivalent.

### The Initial Public Offering ("IPO")

85.     In preparation for its IPO, ConforMIS issued a Registration Statement and Prospectus on Form S-1 on May 21, 2015. The registration statement was amended several times, the last of which was filed on Form S-1/A on June 29, 2015 (collectively, the "Registration Statement").

86.     The Registration Statement contained a preliminary prospectus. The final prospectus (the "Prospectus") was filed on July 1, 2015.

87.     The Registration Statement and Prospectus were filed with the SEC and declared effective as of June 30, 2015.

88.     The Registration Statement was signed by the Individual Defendants.

89.     ConforMIS held its IPO on July 1, 2015, issuing 10.35 million shares and raising aggregate net proceeds of approximately $140 million. The IPO price was set at $15 per share.

90.     ConforMIS stock began trading on the NASDAQ Global Select Market on July 1, 2015.

### Materially False and Misleading Statements in the Prospectus

91.     In the Prospectus, Defendants made numerous representations about ConforMIS's manufacturing facilities and processes and their compliance with applicable laws, regulations, and industry standards.

92.     The Company's Prospectus touted its "state-of-the-art design and manufacturing facilities" and its quality controls over its manufacturing in its own facilities as well as over its suppliers.

93.     Specifically, the Prospectus stated, in relevant part:

*Quality assurance*

We apply a variety of automated and manual quality controls to our iJigs, implant components and other instruments we supply to ensure that our products conform to their specifications. **Members of our quality department also inspect our devices at various steps during the manufacturing cycle** to facilitate compliance with specifications. **Our quality department periodically audits our suppliers** to ensure conformity with our specifications and with our policies and procedures for our devices.

We and our suppliers are subject to extensive regulation by the FDA under its Quality System Regulations, or QSR. The QSR provide that manufacturers must establish and follow quality systems consistent with the QSR framework to ensure that their products consistently meet applicable requirements and specifications. **In accordance with the QSR framework, we have validated or verified the processes used in the manufacturing and testing of our devices**. Our Burlington and Bedford manufacturing facilities are FDA registered, and **we believe they are compliant with the FDA's QSR**. We are in the process of completing our validations of our Wilmington facility and expect to register the facility with the FDA in the second quarter of 2015. We have also received certification from the British Standards Institution, or BSI, a Notified Body to the International Standards Organization of our quality system. Certification by a Notified Body is a necessary element of obtaining CE Marking in the EU. We are subject to periodic, announced and unannounced inspections by BSI, the FDA, and other governmental agencies. We continue to monitor our quality system and management efforts in order to maintain our overall level of compliance.

Prospectus at 116 (emphasis added).

94.     These statements were materially false and/or misleading when made because Defendants failed to disclose or indicate that (i) as detailed, the Company's manufacturing, quality-control, and contamination-control processes were flawed and deficient; and (ii) as a

result of the flaws in the Company's processes, a number of the Company's knee replacement product systems were defective.

95.    In addition, in the "Risk Factors" section of the Prospectus, the Company purported to warn investors that it "may encounter problems or delays in the manufacturing of our products or fail to meet certain regulatory requirements that could result in a material adverse effect on our business and financial results." Prospectus at 27 (emphasis added).

96.    The Prospectus further elaborated:

We may encounter other difficulties in increasing and expanding our manufacturing capacity, including difficulties:

- acquiring raw materials for 3D printing;
- deploying new manufacturing processes, including DMLS 3D printing;
- acquiring 3D printers, especially DMLS 3D printers;
- managing production yields;
- **maintaining quality control and assurance;**
- maintaining component availability;
- **maintaining adequate control policies and procedures;**
- hiring and retaining qualified personnel; and
- complying with state, federal and foreign regulations.

Prospectus at 27–28 (emphasis added).

97.    These statements were materially false and/or misleading when made because Defendants stated that the Company "may" encounter "problems or delays in the manufacturing of our products," "maintaining quality control and assurance," and "maintaining adequate control policies and procedures." But in reality, the Company was *already* experiencing numerous deficiencies and problems in these areas, which ultimately forced the Company to recall hundreds of its products.

17

**<u>Materially False and Misleading Statements on August 11, 2015</u>**

98.     On August 11, 2015, ConforMIS held an earnings call (the "Q2 2015 Earnings

Call"). Defendants Lang and Weiner spoke during this earnings call.

99.     Defendant Lang stated during the Q2 2015 Earnings Call:

> Operationally we've made solid progress in Q2 by moving to our new
> manufacturing facility in Wilmington, Massachusetts. We expect that our move to
> the Wilmington facility will support our growth through 2018, and should have a
> positive impact on our gross margins by reducing our manufacturing and
> overhead cost structure.

100.     Defendant Weiner stated, in response to a question about "milestones from a

manufacturing standpoint" that might affect its gross margins:

> Yes, Chris, we're comfortable with the product gross margins as far as increasing
> in the second half of the year to be pretty consistent with what we've done last
> year. The increase in the second half of the year over the first half of the year will
> be driven primarily by volume increases. As we look out further, then we're
> looking at vertical integration to assist with the increasing gross margins. So for
> the second half of the year, it would be primarily driven by volume increases.
> Also keep in mind that in addition, we have a lower overhead cost structure with
> the move to the Wilmington facility, paired with the streamlined operations that
> Wilmington offers, which will also help in this regard.

101.     Defendant Lang later stated, in response to a question about vertical integration

with respect to manufacturing, that "with regard to the Wilmington facility, we've now really

created the infrastructure, the operating base from which we can scale up our vertical

integration."

102.     In reality, as the market would later learn, the manufacturing and quality-control

processes at the Wilmington facility were seriously deficient, at the very least in relation to

products manufactured during July 18 and August 28, 2015.

103.     These statements were materially false and/or misleading when made because the

Company did not disclose that the supposed "streamlined operations" and reductions in

18

"manufacturing and overhead cost structure" at the Wilmington facility were the result of

deficient quality-control processes.

## The Truth Emerges

104.   On August 31, 2015, just two months after its IPO, the Company suddenly

announced that it had initiated a voluntary recall of the instrumentation for certain of its knee

replacement product systems in response to complaints of moisture on the instrumentation (the

"Recall Press Release"). The Recall Press Release stated, in part:

> **ConforMIS, Inc. (NASDAQ: CFMS)** today announced that it has initiated a
> voluntary recall of specific serial numbers of patient-specific instrumentation for
> its iUni, iDuo, iTotal CR and iTotal PS knee replacement product systems.
> ConforMIS has initiated this action in response to three recent complaints of
> moisture on the patient-specific instrumentation. In all three cases, the knee
> replacement procedures were completed without apparent incident and the
> Company does not believe that the customized knee implants used in these
> procedures were themselves affected. . . .
>
> Based on an initial assessment, ConforMIS believes that the recalled
> instrumentation held excess water before undergoing the commonly used ethylene
> oxide sterilization process and, as a result, may contain small amounts of ethylene
> glycol residue. Ethylene glycol residue may form when ethylene oxide comes into
> contact with water. ConforMIS has temporarily suspended its use of the ethylene
> oxide sterilization process and is working expeditiously to investigate the root
> cause of the excess moisture and evaluate potential corrective and preventative
> actions.
>
> A total of approximately 950 patient-specific instrumentation sets are affected by
> this recall, of which approximately 650 sets were used in knee-implant procedures
> and approximately 300 sets have been shipped but not yet used in scheduled
> surgeries. The patient-specific instruments were manufactured and distributed
> from the Company's new manufacturing facility between July 18, 2015 and
> August 28, 2015.

105.    In the same press release, the Company also disclosed that the recall would have a material adverse effect on its production for the next two months, and that as a result, the Company was lowering its guidance for the fiscal year 2015 by $8 million:

> The Company expects manufacturing to be substantially reduced in September and possibly October as it completes its investigation and executes a plan of resolution. The Company maintains a validated, alternative sterilization process that it already uses in the production of certain of the Company's implants and instruments and plans to increase its reliance on this alternative process until it has completed its investigation and taken all necessary corrective action. This alternative sterilization process has significantly limited capacity as compared to the ethylene oxide sterilization process. The Company expects that the combined impacts of the recalled products which were shipped but not used, the lower production capacity over the period of investigation and resolution and the potential commercial disruption will have a negative effect on its sales. Assuming the effects of these factors, the Company is revising its guidance for the fiscal year 2015 as it now expects total revenue for the full year 2015 in a range of $64 million to $66 million, representing year-over-year growth of 33% to 37% on a reported basis and 39% to 43% on a constant currency basis. This revised revenue guidance is a reduction of $8 million as compared to the previous revenue guidance in a range of $72 million to $74 million.

106.    The revelation of the recall was a materialization of the previously undisclosed risks caused by the Company's deficient manufacturing and/or quality-control processes.  Such risks are particularly damaging to ConforMIS because ConforMIS generates nearly all of its revenues through the sale of customized joint-replacement devices.

107.    On the news of the recall, the Company's stock dropped $3.78, or 19.11%, to close at $16.00 on August 31, 2015. At the close of trading on September 2, 2015, the Company's share price closed at $14.18 per share.

108.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Lead Plaintiff and other Class members have suffered significant losses and damages.

### Additional Scienter Allegations

109.    Each of the Individual Defendants:

- directly participated in the management of the Company;
- was directly involved in the day-to-day operations of the Company at the highest levels;
- was privy to confidential proprietary information concerning the Company and its business and operations;
- was involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;
- was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and
- approved or ratified these statements in violation of the federal securities laws.

110.    ConforMIS was a small company with one core business and one revenue source: sales of knee-replacement products. Accordingly, knowledge of any material facts concerning its processes for manufacturing these products is imputed to the Individual Defendants.

111.    In preparing for its IPO, the Company's management had an incentive to inflate the Company's prospects in the eyes of investors by speeding up manufacturing, pressuring employees to reduce costs even to the detriment of quality control, and concealing any resulting quality-control problems until the Company could no longer ignore them.

112.    As officers, directors, and controlling persons of a publicly-held company whose securities are and were registered with the SEC pursuant to the Exchange Act, and traded on NASDAQ and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate accurate and truthful information promptly with respect to the Company's business prospects and operations, and to correct any previously-issued statements that had become materially misleading or untrue to allow the market price of the Company's publicly-traded stock to reflect truthful and accurate information.

113.    In violation of this duty, the Individual Defendants knew and/or recklessly disregarded that their statements concerning the Company's business were materially false and misleading.

**Corporate Scienter**

114.    ConforMIS is liable for the acts of the Individual Defendants and its employees under the doctrine of respondeat superior and common law principles of agency, as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

115.    In particular, on December 23, 2015, the Company announced that Matthew Scott, Senior Vice President of Operations, had resigned effective December 31, 2015.

116.    Mr. Scott is the individual identified by Confidential Witness 6 and Confidential Witness 1 as having pressured employees to achieve unrealistic production numbers, which led to employees taking serious shortcuts in their quality-control procedures.

117.    Mr. Scott's knowledge and/or reckless disregard of the Company's defective quality-control procedures in relation to manufacturing knee implants is imputed to the Company.

118.    Similarly, the scienter of other employees and agents of the Company is similarly imputed to ConforMIS under respondeat superior and agency principles.

**CLASS ACTION ALLEGATIONS**

119.    Lead Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired ConforMIS securities trade on NASDAQ during the Class Period and who were damaged upon revelation of the alleged corrective disclosure. Excluded from the Class are

Defendants, the officers and directors of the Company at all relevant times, members of their immediate families, and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

120.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, ConforMIS common stock was actively traded on NASDAQ. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by ConforMIS or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

121.     Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

122.     Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

123.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of ConforMIS;

- whether the Individual Defendants cause ConforMIS to issue false and misleading statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading statements;

- whether the prices of ConforMIS securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

124.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

125.    Lead Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the misrepresentations and omissions were material;

- ConforMIS securities are traded in efficient markets;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Lead Plaintiff and members of the Class purchased and/or sold ConforMIS securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

126.     Based upon the foregoing, Lead Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

127.     Alternatively, Lead Plaintiff and members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

128.     At all relevant times, the market for ConforMIS securities was an efficient market for the following reasons, among others:

- ConforMIS's securities met the requirements for listing, and were listed and actively traded on NASDAQ, a highly efficient and automated market;

- ConforMIS filed periodic public reports with the SEC and NASDAQ; and

- ConforMIS regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

129.     As a result of the foregoing, the market for ConforMIS's securities promptly digested current information regarding ConforMIS from all publicly available sources and reflected such information in ConforMIS's stock price. Under these circumstances, all purchasers of ConforMIS's securities during the Class Period suffered similar injury through

their purchases of ConforMIS's securities at artificially inflated prices, and a presumption of reliance applies.

**NO SAFE HARBOR**

130.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many or all of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that those statements were false when made.

**<u>COUNT ONE</u>**

**Violation of Section 11 of the Securities Act Against All Defendants**

131.     Lead Plaintiff repeats and incorporates each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness, scienter, or intentional misconduct.

132.     This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants.

133.    The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and/or omitted to state material facts required to be stated therein.

134.    ConforMIS is the registrant for the IPO. Individual Defendants named herein were responsible for the contents and dissemination of the Registration Statement.

135.    As issuer of the shares, ConforMIS is strictly liable to Lead Plaintiff and the Class for the misstatements and omissions.

136.    None of the Individual Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

137.    By reasons of the conduct herein alleged, each Individual Defendant violated Section 11 of the Securities Act.

138.    Lead Plaintiff acquired ConforMIS securities pursuant and/or traceable to the Registration Statement for the IPO.

139.    Lead Plaintiff and the Class have sustained damages. The value of ConforMIS securities has declined substantially due to the Defendants' violations.

## COUNT TWO

**Violation of Section 15 of the Securities Act Against Individual Defendants**

140.    Lead Plaintiff repeats and incorporates each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness, scienter, or intentional misconduct.

141.    This count is asserted against the Individual Defendants and is based upon Section 15 of the Securities Act.

142.     Individual Defendants, by virtue of their offices, directorship, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of ConforMIS within the meaning of Section 15 of the Securities Act. Individual Defendants had the power and influence and exercised the same to cause ConforMIS to engage in the acts described herein.

143.     Individual Defendants' positions made them privy to and provided them with actual knowledge of the material facts concealed from Lead Plaintiff and the Class.

144.     By virtue of the conduct alleged herein, the Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Lead Plaintiff and the Class for damages suffered.

## COUNT THREE

**Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants**

145.     Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

146.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; and (2) cause Lead Plaintiff and other members of the Class to purchase ConforMIS's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, each of the Defendants took the actions set forth herein.

147.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and/or (c) engaged in acts, practices, and a course of business that

operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to

maintain artificially high market prices for ConforMIS securities in violation of Section 10(b) of

the Exchange Act and Rule 10b-5 promulgated thereunder. All Defendants are sued either as

primary participants in the wrongful and illegal conduct charged herein or as controlling persons

as alleged below.

148.    Defendants, individually and in concert, directly and indirectly, by the use, means

or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

continuous course of conduct to conceal adverse material information about the business and

future prospects of ConforMIS as specified herein.

149.    These Defendants employed devices, schemes, and artifices to defraud while in

possession of material adverse non-public information, and engaged in acts, practices, and a

course of conduct as alleged herein in an effort to assure investors of ConforMIS's value and

performance and continued substantial growth, which included the making of, or participation in

the making of, untrue statements of material facts and omitting to state material facts necessary

in order to make the statements made about ConforMIS and its business operations and future

prospects in the light of the circumstances under which they were made, not misleading, as set

forth more particularly herein, and engaged in transactions, practices and a course of business

that operated as a fraud and deceit upon the purchasers of ConforMIS securities during the Class

Period.

150.    Each of the Individual Defendants' primary and controlling-person liability arises

from the following facts: (1) the Individual Defendants were high-level executives, directors,

and/or agents at the Company during the Class Period and members of the Company's

management team or had control thereof; (2) each of these Defendants, by virtue of his

responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's business prospects and operations; (3) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's operations and business projects at all relevant times; and (4) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

151.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the Company's flawed manufacturing processes, thereby artificially inflating price of its securities. As demonstrated by Defendants' omissions and misstatements of the Company's business strategy throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

152.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of ConforMIS securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of ConforMIS's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the

securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Lead Plaintiff and the other members of the Class acquired ConforMIS securities during the Class Period at artificially high prices and were or will be damaged thereby.

153.    At the time of said misrepresentations and omissions, Lead Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Lead Plaintiff and the other members of the Class and the marketplace known the truth regarding the Company's flawed manufacturing processes, which was not disclosed by Defendants, Lead Plaintiff and other members of the Class would not have purchased or otherwise acquired their ConforMIS securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

154.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

155.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

156.    This action was filed within two years of discovery of the fraud and within five years of each plaintiff's purchases of securities giving rise to the cause of action.

## **COUNT FOUR**

**Violation of Section 20(a) of the Exchange Act Against the Individual Defendants**

157.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

158.    The Individual Defendants acted as controlling persons of ConforMIS within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, agency, ownership and contractual rights, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Lead Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Lead Plaintiff to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

159.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

160.    As set forth above, ConforMIS and the Individual Defendants each violated Section 10(b), and Rule 10b-5 promulgated thereunder, by their acts and omissions as alleged in this Complaint.

161.    By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

162.     This action was filed within two years of discovery of the fraud and within five years of each plaintiff's purchases of securities giving rise to the cause of action.

**WHEREFORE**, Lead Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating Lead Plaintiff as Lead Plaintiff and certifying Lead Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Such other and further relief as the Court may deem just and proper.

<strong>JURY TRIAL DEMANDED</strong>

Lead Plaintiff hereby demands a trial by jury.

Dated: January 11, 2016

Respectfully submitted,

/s/ Jeremy A. Lieberman
**POMERANTZ LLP**
Jeremy A. Lieberman
Murielle J. Steven Walsh
600 Third Avenue, 20th Floor
New York, New York 10016
(212) 661-1100

*Attorneys for Plaintiff*

<strong><u>CERTIFICATE OF SERVICE</u></strong>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants.

/s/ Jeremy A. Lieberman